Filed 1/13/15  P. v. West CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DWAYNE BASIL WEST,<br><br>Defendant and Appellant. | B248847<br><br>(Los Angeles County<br>Super. Ct. No. BA364530) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Monica Bachner, Judge.  Affirmed.

Law Offices of Leo James Terrell and Leo James Terrell for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Dwayne Basil West appeals from his conviction, following a jury trial, of assault on Peace Officer Leslie Salinas with a semi-automatic firearm (count 2), assault on Peace Officer Salinas by means likely to produce great bodily harm (count 5), resisting arrest with removal of a firearm from Peace Officer Alex Pineda (count 6), and two counts of resisting arrest (counts 7 and 8).[1] Defendant contends: (1) it was prejudicial error to deny defendant's pretrial motion for discovery of the two officers' DNA; (2) there was prosecutorial misconduct; (3) the trial court should have excused three jurors for bias; (4) the evidence was insufficient to support the conviction on the substantive counts and the gun use enhancements; (5) reversal is necessary because the written jury instructions cannot be located; and (6) there was instructional error. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The People's Case*

Viewed in accordance with the usual rules of appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358 (*Zamudio*)), the evidence established that defendant was diagnosed as a paranoid schizophrenic some time prior to October 15, 2009. That day, defendant's mother, Cherrie Hewlett, called the Los Angeles Department of Mental Health to ask for help because defendant was hearing voices.

Dr. Christopher Franklin, a clinical psychologist employed by the Department of Mental Health as a member of a mobile team that evaluates persons to determine whether they require confinement pursuant to Welfare and Institutions Code section 5150, spoke to Hewlett on the phone that day. Hewlett told Franklin that defendant had been diagnosed with paranoid schizophrenia, was hallucinating about an intruder in their

---

[1]    A mistrial was declared as to counts 1 (attempted premeditated murder) and 4 (assault on a peace officer) after the jury failed to agree on a verdict as to those counts. Defendant was sentenced to 25 years to life in prison comprised of the five-year low term on count 2, plus a consecutive 20 years for the gun use enhancement. Concurrent sentences were imposed on the remaining counts. The mistried counts were dismissed.

2

apartment, and that defendant was "fighting" with this imaginary person (i.e. shadow boxing). Franklin explained to Hewlett that the police might have to be called to help get defendant to the hospital. Franklin and psychiatric nurse Jimmy Loya drove separately to the apartment building. When Hewlett opened the front door in response to their knock, Franklin saw defendant standing behind her. Based on defendant's demeanor, Franklin formed the opinion that he might be violent and that it was too dangerous for Franklin and Loya to enter the apartment to interview defendant. Instead, Franklin and Loya retreated to the sidewalk and called for police assistance and a non-emergency ambulance. Within about half an hour, uniformed Police Officers Leslie Salinas and Alex Pineda arrived; Pineda was a recent Police Academy graduate and Salinas was his training officer.

Franklin explained to Salinas and Pineda that he was placing a Welfare and Institutions Code section 5150 hold on defendant, who was a 27-year-old male diagnosed as a paranoid schizophrenic experiencing hallucinations. Franklin asked whether they wanted to wait for the ambulance to arrive, but the officers elected to not do so. While Loya remained outside waiting for the ambulance, Franklin followed the officers into the apartment and down a short hallway at the end of which was an open door into a bedroom. Franklin saw the two officers, whose backs were to Franklin, standing on the hallway side of the open door to the bedroom. Defendant was about six feet away from the officers, standing on the bedroom side of the open door and facing them. Hewlett was standing immediately behind defendant. After a few minutes, Loya arrived and stood behind Franklin.

The officers and Hewlett tried to convince defendant to go into the living room to talk to the doctor, but defendant refused. And when one of the officers said, "See, your mom is saying to come on, listen to your mom," defendant said, "that is not my mother." This statement indicated to Franklin the severity of defendant's thought disorder. Defendant did not charge towards the officers, but he was becoming increasingly agitated in response to their entreaties that he come out of the bedroom. When defendant threatened to "smash" the officers' faces, the officers' tone changed from "rapport

3

building" to "directive" and they instructed defendant to turn around and put his hands together. The officers refused defendant's request to go to the bathroom. When defendant put his hand under his shirt, the officers loudly commanded him not to do that and one of the officers unholstered a taser. Next, defendant put his hands in his pants. Franklin turned and walked a few steps towards the front door because he did not want to see defendant being tased. Franklin heard a sound that he recognized as someone being tased. With his back still to the bedroom, Franklin took out his phone to call paramedics. Next, Franklin heard sounds he did not associate with a taser and when Loya said, "run," Franklin ran out of the apartment. As he was running, Franklin heard what sounded like two gunshots. Then, while standing with Loya in the front yard, Franklin heard two more gun shots. Franklin called his supervisor, and Loya called 911.

Jimmy Loya's recollection of events was generally consistent with Franklin's, with some exceptions. Loya recalled that Hewlett met with Franklin on the sidewalk, then went back into the apartment before Franklin and Loya went to the front door. He estimated that the officers and Franklin were in the apartment for 15 minutes before Loya joined them. Loya saw defendant and Hewlett standing in the middle of the hallway facing the officers and Franklin, whose backs were to Loya. Defendant was yelling things like, "Get the fuck out of my house," and being verbally aggressive, while the officers tried to reason with him. When defendant indicated he did not recognize his mother, she complied with Loya's instructions to go into the back room for her own safety. About 10 minutes into the exchange, defendant raised his arm to about a 30 degree angle from the ground, pointed his index finger toward the officers, took a few steps forward and told them to leave. Both officers took a few steps back and Pineda unholstered his taser; he warned defendant that if defendant took another step forward, Pineda would tase him. Defendant said, "You ain't gonna do anything, even one gun pointed at me, I'm going to take that gun away from you, and I'm going to beat the crap, daylights, the living daylights out of you. I'm going to wop you." When defendant took another step forward, Pineda tased him. Defendant fell back against a wall, but then pulled the darts off of his chest and said, "Now what? . . . You don't have any tasers to

4

work with." Salinas ran toward defendant and tried to mace him. Defendant and the two officers began to struggle. In the course of that struggle, they opened the door to the room into which defendant's mother had fled. While they were struggling, Loya ran outside and called 911.

Officer Pineda recalled that he was standing in the hallway about 10 to 12 feet from defendant when he said, "Hi Dwayne, how are you doing. I'm Officer Pineda and I'm here to talk to you." Defendant said he did not want to talk and told the officers and Franklin to get out of the house. Defendant did not recognize Hewlett as his mother. Defendant said, "Get the fuck out of my house or I'll beat your ass," and then started speed walking towards the officers with clenched fists. When defendant got about an arm's length away, Pineda pushed him back. Defendant walked back 10 or 12 feet. Pineda pulled out his taser and told defendant to turn around and put his hands on his head. Pineda intended to arrest defendant for obstructing the officers' investigation of a section 5150 hold by swearing and threatening the officers. Defendant said, "Put your little taser away or I'll kick you're guys' ass, fuck you, don't come in with your little police tie on, get the fuck out of my house." Pineda told Salinas he thought they should call for back up. While Salinas was doing that, Pineda continued to give commands to defendant to turn around and put his hands on his head, and to warn defendant that he would be tased if he did not comply. Salinas told Pineda to get ready to use the taser if necessary. When defendant took one step forward, Pineda tased him. Defendant fell back against the closed bedroom door. Defendant grabbed the taser wires. While defendant was still holding the wires, Pineda pressed the taser trigger a second time for about five seconds. Defendant then threw the taser prongs back at the officers. Pulling out her pepper spray, Salinas yelled at defendant to turn around and put his hands on his head. As defendant tried to go into the bedroom, Salinas pepper sprayed him in the face and then followed him into the bedroom. Pineda followed Salinas into the bedroom, which was dark except for ambient lighting from the hallway. Salinas moved Hewlett, who was between Salinas and defendant, behind her and in front of Pineda. Pineda moved Hewlett behind him. Pineda saw his partner and defendant trading punches.

Pineda pulled defendant off Salinas but fell back on the bed with defendant on top of him. Defendant escaped Pineda's hold, turned around and punched Pineda in the face, causing Pineda to "see stars." When Pineda felt defendant pulling his gun, Pineda pushed it down ("capped" it) so that defendant could not get the weapon. As Pineda moved off the bed, Pineda saw defendant and Salinas fighting. Defendant was holding a collapsible baton, which Pineda was able to grab away. Defendant punched Pineda in the face again, causing Pineda to fall back onto the bed. When Pineda got up, he saw Salinas lying on her back against a television and defendant choking her with both hands. Salinas was gasping for air. While Pineda was trying to pull defendant off Salinas, Pineda felt defendant pulling Pineda's gun out of its holster, then saw defendant starting to move the gun such that it was be pointed at Salinas. Pineda announced that defendant had Pineda's gun while at the same time grabbing defendant's wrist and trying to push the gun away. Defendant fired the gun. Pineda then moved the slide so that the gun would malfunction if fired again, and successfully got the gun away from defendant.

Defendant started to choke Salinas again. Pineda tried to shoot defendant, but the gun malfunctioned. After he cleared the malfunction, Pineda heard a shot. Pineda did not know who fired the shot and defendant, who was still on top of Salinas, did not react. So, Pineda fired twice at defendant; there was no more than a second between the two shots. After the second shot, defendant started falling to the ground. Pineda pulled Salinas off of the television and they handcuffed defendant. The first backup officer arrived about 10 seconds after defendant was handcuffed. Pineda and Salinas were separated. Pineda did not seek medical attention for any facial injuries.

Officer Salinas's recollection of events differed somewhat from Pineda's. She recalled defendant did not believe they were real police officers and told them to get out of his house with their "fake guns and badges." When defendant started to walk towards the officers, Pineda pulled out his taser and instructed defendant to turn around and put his hands behind his back to avoid being tased. Salinas did not see Pineda push defendant. Defendant stopped, but when he took another step towards the officers, Pineda tased defendant twice. Defendant was about 12 feet away from Pineda when

6

Pineda tased him. After defendant pulled out the taser wires, Salinas stepped in front of Pineda and pepper sprayed defendant from a distance of about 6 to 10 feet away. Defendant ran into a bedroom and tried to shut the door, but Salinas forced the door open and followed defendant into the bedroom. As defendant was reaching under the bed, Salinas tried to handcuff him. A struggle ensued during which Salinas punched defendant with a closed fist and hit him with her knee. At one point, defendant pushed Salinas, who fell back on a television. Defendant held Salinas by the neck with one hand and punched her with the other. After defendant let go of her neck, but while he was still standing in front of her, Salinas heard Pineda say, "He's got my gun, he's got my gun," followed by a gunshot. Salinas did not know who fired the shot and never saw defendant with a gun. While still lying back on the television, Salinas drew her weapon and fired at defendant. Defendant stumbled backwards and, a few seconds later, fell to the ground. Salinas stood up and when defendant started to get up, she kicked him in the torso to keep him down. After Salinas and Pineda handcuffed defendant, Salinas broadcast a call for help. Salinas heard just two gun shots: her own and the one just before hers. Salinas was hospitalized after the incident; she had a severe headache as well as a black eye and scratches and bruises on her neck, cheeks, legs and arms.

Detective Brian Whetsel responded to the officer involved shooting of defendant. He was unable to perform a gunshot residue test on defendant, because defendant was in surgery when Whetsel arrived at the hospital to perform the test. By the time defendant was out of surgery, it was too late to perform the test.

Detective Peter Stone caused a DNA sample to be obtained from defendant and Pineda's gun to be tested for DNA. Stone did not cause a DNA sample to be obtained from Salinas' neck. Stone did not cause Pineda's gun to be fingerprinted because there is a low probability of obtaining fingerprints from a gun unless the gun is subjected to chemical testing that will render it inoperable. In particular, the gun in this case was a Glock with a rough surface grip that does not hold fingerprints well. Similarly, Stone did not obtain fingerprints from the collapsible baton because the rubber handle does not hold

7

fingerprints well.  Stone did not obtain fingerprints from Pineda's "sam brown" belt or holster.

B.      *The Defense Case*

Hewlett, defendant's mother, testified that defendant did not comply with police commands while in the hallway, before he was tased.  After defendant was tased, Hewlett followed him into the dark bedroom.  The two police officers entered the bedroom, pushed defendant onto the bed and started beating and kicking him.  Defendant fought back.  Pineda hit defendant on the back with a black stick and said, "Dwayne stop.  I'm going to shoot."  Defendant was standing in the middle of the room when Pineda shot him three times.  Hewlett did not see Salinas shoot and never saw defendant holding a gun.  Hewlett did not hear any officer say that defendant had taken a gun.

**DISCUSSION**

A.      *The Court's Order Denying Defendant's Motion for DNA Samples From Officers Salinas and Pineda Was Not an Abuse of Discretion*

Defendant contends denial of his pretrial motion seeking discovery of DNA reference samples from Salinas and Pineda was an abuse of discretion.  He argues DNA reference samples from the two officers were necessary to "exclude or diminish the probability that [defendant] was a contributor of the mixed DNA" found on Pineda's gun, holster and sam brown.  We disagree.

Section 1054.1 requires the People to disclose to the defense "(c) All relevant real evidence seized or obtained as a part of the investigation of the offenses charged.  [¶]  . . . (e) Any exculpatory evidence.  [¶]  (f) Relevant . . . reports or statements of experts made in conjunction with the case, including the results of . . . scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial."[2]  The People also have a constitutional duty to disclose exculpatory evidence to the defense.  (*People*

---

**2**      All undesignated statutory references are to the Penal Code.

8

*v. Bowles* (2011) 198 Cal.App.4th 318, 325 [inconclusive fingerprint evidence is "exculpatory"]; *Brady v. Maryland* (1963) 373 U.S. 83, 87.)

In this case, the People gave defendant the People's DNA expert's reports which concluded there was a mixture of DNA on Pineda's gun and gun belt, defendant was excluded as the major contributor of that DNA, but he could not be excluded as the minor contributor.[3] After several trial continuances so that his DNA expert could examine the evidence, defendant filed a written motion seeking DNA samples from Pineda and Salinas. According to the motion, the samples would enable the defense to "show with a high level of confidence that [defendant's] DNA is excluded" from Pineda's equipment. Defense counsel's supporting declaration stated that, to exclude defendant as even a minor contributor of the DNA on Pineda's equipment, the expert required DNA samples from the two officers. According to the expert's declaration, the accurate interpretation of mixed samples "becomes impossible when reference samples for *all possible contributors* are not available." (Italics added.) The People opposed the motion on the grounds that (1) as crime victims, the officers could not be compelled to give DNA samples (see Cal. Const. art. 1, § 28 [victim has right to refuse defense discovery request]); (2) because the DNA samples were not in the possession of the prosecution, the prosecution was not compelled to produce them under Penal Code section 1054.1 or *Brady, supra,* 373 U.S. 83; and (3) the officers' DNA would not be exculpatory because the expert stated he would require samples from "all possible contributors" of the DNA found on Pineda's equipment, but the motion did not seek DNA from everyone who had touched Pineda's equipment (investigating officers, paramedics, etc.); further, nothing would change the fact that there was a 1 in 10 chance that defendant was one of the DNA contributors.

At the hearing on the motion, defendant argued that the officers' privacy rights did not trump his right to exculpatory evidence. The prosecutor countered with the same arguments contained in the People's written opposition. The trial court concluded that it

---

[3] The expert made similar findings with respect to Salinas's equipment; there was no allegation that defendant attempted to take Salinas's gun.

9

did not have jurisdiction over the victims to compel them to give a DNA sample. Further, it found the evidence was not relevant: ". . . I'm not sure it proves anything, because . . . the [gun] was in the hands of many many people and my initial instincts told me that particularly the belt would almost certainly have the officer's, whose belt it was, DNA on it. [¶] If we don't have all the other samples, your expert can't eliminate the defendant so I think, even if we got the samples . . . it would be much ado about nothing."

Apart from whether the trial court can compel a police officer who is the victim of a crime relating to the officer's performance of his duty to provide a DNA sample under certain circumstances, defendant has not established that the DNA evidence he sought was relevant, much less exculpatory in this case. Whether Salinas's or Pineda's DNA is on Pineda's equipment is irrelevant to whether defendant grabbed Pineda's gun and fired it in the manner Pineda described in his testimony. Of course Pineda's DNA is on his own equipment. And it would not be surprising if Salinas's DNA is on it also, since they are in close physical contact while driving in the patrol car. The presence of either officers' DNA on the equipment would not prove anything. As we discuss further in the next section, the lack of DNA evidence was the subject of defense closing argument and obviously was a weakness in the prosecutor's case.

B.      *There Was No Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct by making "false statements of facts during closing rebuttal." Specifically, defendant challenges the prosecutor's statement that the DNA evidence was "inconclusive," which was made in response to defense counsel's closing argument that the jury should take into account that the People did not introduce the DNA test results into evidence. Defendant argues "the statement is false as the DNA evidence shows they [sic] were a mixture and [defendant] is not a major contributor."

First, we note that a defendant may not complain of prosecutorial misconduct on appeal unless he made a timely objection on that ground in the trial court, and requested that the jury be admonished to disregard the impropriety. (*People v. Christensen* (2014)

10

229 Cal.App.4th 781, 802.) Defendant's failure to make a timely objection to the prosecutor's challenged statements constitutes a forfeiture of the issue, especially since a curative instruction that there was no evidence the DNA was "inconclusive" would have eliminated any error.

Even if defendant had not forfeited the issue, we would find no merit in his claim. "Within the scope of permissible prosecutorial argument, a prosecutor is given wide latitude during argument ' " ' "as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom . . . ." ' " ' [Citation.]" (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1529.)

Here, the only DNA evidence introduced was Stone's testimony that he caused DNA testing to be done. The results of that testing were not introduced into evidence by either side. The only reasonable inference from the evidence that DNA testing was done and the fact that the results of that evidence were not introduced by the People or defendant, is that the evidence was not favorable to either side. In other words, that it was "inconclusive." Under these circumstances, the prosecutor's statement amounts to fair comment on the evidence and did not constitute prosecutorial misconduct.

C.     *There Was No Juror Bias Shown*

Defendant contends he was denied a fair trial because the jury included three biased members: Juror Nos. 71, 38 and 66. We find no merit in the contention as to any of the three.

"Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be 'unable to faithfully and impartially apply the law in the case.' [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 910.) On appeal from

11

the trial court's failure to remove a juror for cause, a defendant must establish that he or she (1) exercised a peremptory challenge to remove the juror in question; (2) exhausted the defendant's peremptory challenges; and (3) communicated to the trial court the defendant's dissatisfaction with the jury selected. (*People v. Crittenden* (1994) 9 Cal.4th 83, 121.)

### 1. Juror No. 71

The jury was sworn in on September 20, 2012, and instructed to return the next day at 1:30 p.m. At about noon the next day, Juror No. 71 left a voicemail message for the trial court stating he knows defense counsel. When questioned later that day, Juror No. 71 clarified that he "knows of" defense counsel. Juror No.71 explained that defense counsel looked familiar during voir dire, but Juror No. 71 could not place him. When Juror No. 71 went home that night, he mentioned defense counsel's name to his wife (without discussing the case); she reminded him that she had called in to a talk radio show that defense counsel had hosted a few weeks earlier. Juror No. 71 and his wife were Mormons and callers to the show were discussing whether Mormons were Christians. Juror No. 71's wife called in to say that Mormons were Christians. Juror No. 71 did not hear the entire conversation, but his wife said that defense counsel agreed with the callers who said that Mormons were not Christians. Juror No. 71 took issue with defense counsel taking such a position without knowing the facts. Asked whether this would affect his ability to be a fair juror, Juror No. 71 said, "No, I don't believe so. You know, this case is about believing the stories, are very different from what we've heard. It's just deciding who is telling the truth." Asked a second time, Juror No. 71 reiterated, "I don't believe so. Like I said, I'm going to listen to the evidence as it's presented and make a judgment and discuss with the jurors when it comes time to deliberate." Defense counsel asked that Juror No. 71 be removed for cause because he was not candid during voir dire when he did not disclose that he knew defense counsel and because the statement "I don't believe so" was equivocal. The trial court stated that it would not

12

remove Juror No. 71 "today. You're welcome to brief it if you wish." Defense counsel stated that he would brief the issue for the following Monday, but he did not do so.

We find no abuse of discretion in the trial court's conclusion that Juror No. 71 could be a fair and impartial juror. First, we do not agree that Juror No. 71 was "not candid" during voir dire. At most, defense counsel only seemed familiar during voir dire. It was not until that night that Juror No. 71 realized why that was the case and, even though Juror No. 71 never spoke to defense counsel himself, he reported to the court the next morning that he "knew of" defense counsel. Rather than showing bias, Juror No. 71's comments to the court made voluntarily and not in response to a question by court or counsel, suggest the juror took his responsibilities seriously. Juror No. 71's conduct was entirely appropriate. Second, Juror No. 71 responded affirmatively when asked whether he could be fair despite his familiarity with defense counsel's radio talk show. Considered in context with Juror No. 71's entire response, "I believe so" was simply a turn of phrase and did not render his affirmation of fairness equivocal.[4]

### 2.    Juror Nos. 38 and 66

The issue with respect to Jurors No. 38 and 66 is slightly different. Defendant complains on appeal that Juror Nos. 38 and 66 made statements during voir dire to the effect that defendant's appearance bothered them, he looked "unkempt" and "intimidating." In addition, Juror No. 38 may have seen defendant in his jail clothes. These statements, defendant argues, show that Juror Nos. 38 and 66 were biased against defendant. Although defendant had used all of his peremptory challenges, he did not challenge either juror for cause and he did not express dissatisfaction with the jury selected. Not only do the jurors' remarks not demonstrate bias, defendant has forfeited the issue.

---

[4]    A trial court could reasonably conclude that a juror who reported that s/he "knew" s/he could be fair was only responding by rote.

D.	*Substantial Evidence Supports Conviction on Each Count and the Enhancements*

Defendant contends the evidence was insufficient to support conviction on each of the substantive counts and the personal gun use enhancements. As to each count and the enhancement, defendant's argument is essentially the same: (1) no forensic evidence linked defendant to Pineda's gun; (2) defendant was acting in self-defense because the officers used excessive force; (3) defendant did not act willfully; and (4) defendant did not know Salinas and Pineda were police officers.

The standard of review for a challenge to the sufficiency of the evidence to support a criminal conviction is well settled. We review the whole record in the light most favorable to the judgment to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt; we presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence; it is the exclusive province of the jury to determine the credibility of a witness and evidentiary conflicts; and even testimony that is "subject to justifiable suspicion" does not justify reversal. (*Zamudio, supra*, 43 Cal.4th at pp. 357-358.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*Ibid*.) "The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] . . . Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*Id.* at pp. 357-358.) Whether a defendant used or discharged a firearm in the commission of a qualifying offense is subject to the same standard. (*People v. Frausto* (2009) 180 Cal.App.4th 890, 897.)

14

### 1.    Count 2 (§ 245, subd. (d)(2))

Defendant contends there was insufficient evidence to support the conviction of assault with a firearm on a police officer (Salinas) as charged in count 2.  Count 2 alleged a violation of section 245, subdivision (d)(2), which makes it a crime to commit "an assault upon the person of a peace officer [in this case, Salinas] . . . with a semiautomatic firearm [when the perpetrator] knows or reasonably should know that the victim is a peace officer . . . engaged in the performance of his or her duties, when the peace officer . . . is engaged in the performance of his or her duties . . . ."  Contrary to defendant's assertion, there was substantial evidence that defendant violated section 245, subdivision (d)(2).

We dispense with one argument summarily:  the lack of forensic evidence linking defendant to Pineda's gun does not require reversal.  Appellant has supplied no authority for such a proposition.  We instead turn to the other evidence.  Pineda testified that defendant grabbed his gun and fired off a shot during the struggle in the dark bedroom.  Even without forensic evidence, Pineda's testimony constitutes substantial evidence that defendant "did an act with a firearm that by its nature would directly and probably result in the application of force to a person."  Even assuming Pineda's version of events was "improbable," it was not impossible and even testimony that is "subject to justifiable suspicion" does not justify reversal.  (*Zamudio, supra*, 43 Cal.4th at pp. 357-358.)  For the same reason, defendant's argument that there was insufficient evidence that defendant "willfully aimed and fired the gun" fails.  Pineda's testimony was sufficient to establish that defendant had possession of the gun and intentionally fired it.  That the evidence may have also supported a finding of accidental firing does not require reversal.

We also find no merit in defendant's argument that there was insufficient evidence that defendant acted "willfully" because he "was forced to protect and defend himself from the officers' acts of aggression."  It is undisputed that the officers were called to help Franklin and Loya place defendant on a psychiatric hold because defendant was believed to be a danger to himself or others.  But defendant refused the officers' request

15

to come out of the hallway to talk to the doctor, indicated he did not recognize Hewlett as his mother (Franklin testified that he was concerned for Hewlett's safety), and made verbal threats and started to move towards the officers in a menacing way. From this evidence, a reasonable juror could conclude that defendant's refusal to comply with proper orders was the triggering event that caused Pineda to use the taser and that Pineda used reasonable force. For the most part, other witnesses corroborated Pineda's account and the few discrepancies do not compel us to reject the jury's verdict as a matter of law.

Defendant's argument that there was insufficient evidence that Salinas and Pineda were lawfully performing their duties because the evidence established they used excessive force is unpersuasive for the same reason.

Also unpersuasive is defendant's argument that there was insufficient evidence that defendant was "aware of his surroundings and the identities of the individuals around" or that he knew Salinas and Pineda were police officers performing their duties. While there was evidence from which the jury could conclude defendant mistakenly believed Salinas and Pineda were intruders, not police officers, there was also evidence from which it could reasonably be inferred that defendant recognized them as police officers. Specifically, Pineda testified that after he warned defendant to comply or be tased, defendant said, "Put your little taser away . . . don't come in with your *little police tie on*, get the fuck out of my house." (Italics added.) This statement suggests defendant knew Salinas and Pineda were police officers.

Defendant fairs no better with the argument that there was insufficient evidence that defendant "acted with the present ability to apply force with a semiautomatic firearm to a person." From Pineda's description of the struggle for the gun, it is reasonable to infer that defendant was trying to point the gun at Salinas. That Pineda was trying to wrest the gun away from defendant does not contravene the finding that defendant had the present ability to apply force to Salinas with Pineda's gun.

16

### 2. Firearm Enhancements (§ 12022.53, subdivisions (b) & (c))

Defendant contends there was insufficient evidence to support both the enhancement for personal use of a firearm (§ 12022.53, subd. (b)) and the one for personal discharge of a firearm (§ 12022.53, subd. (c)) because he did not display the gun in a menacing manner, hit anyone with it, or intentionally fire it. But a reasonable inference from Pineda's testimony is that defendant intentionally fired the gun. That the evidence would have also supported a finding of accident does not compel reversal.

It is also immaterial that defendant did not have exclusive control of the gun at the time it was discharged because Pineda was then struggling with defendant for it. The jury could reasonably concluded that defendant was holding the gun and fired it, even though Pineda was trying to get it away from defendant. Also unpersuasive is defendant's argument that the personal discharge of a firearm did not occur "during" the assault on Salinas, because that assault ended when Pineda moved defendant's hand holding the gun so that it was no longer pointing at Salinas. The assault did not end when defendant was no longer pointing the gun directly at Salinas because a reasonable inference from the evidence is that defendant was still trying to shoot Salinas. More fundamentally, it was the discharge of the gun that was an assault; and by definition, it was by use of a weapon.

### 3. Count 5 (§ 245, subd. (c))

Defendant contends there was insufficient evidence to support the conviction of assault on a peace officer (Salinas) by force likely to produce great bodily injury as charged in count 5. Count 5 alleged a violation of section 245, subdivision (c), which makes it a crime to "commit[] an assault . . . by any means likely to produce great bodily injury upon the person of a peace officer . . . [by a perpetrator] who knows or reasonably should know that the victim is a peace officer . . . engaged in the performance of his or her duties, when the peace officer . . . is engaged in the performance of his or her duties . . . ."

As we have already explained vis a vis count 2, there was substantial evidence from which the jury could conclude that Salinas was lawfully performing her duties and that defendant was not acting in self-defense against excessive force.

### 4.    Count 6 (§ 148)

Defendant contends there was insufficient evidence to support the conviction of removing or taking a weapon while resisting, delaying or obstructing an officer [Pineda] as charged in count 6.  Count 6 alleges a violation of section 148, subdivision (a), which makes it a crime to "willfully resist[], delay[], or obstruct[] any public officer, peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . ."  Subdivision (c) of section 148 provides an enhanced sentence for: "Every person who, during the commission of any offense described in subdivision (a), removes or takes a firearm from the person of, or immediate presence of, a public officer . . . ."

As we have explained, defendant's argument that Pineda was not lawfully performing his duties because he was using excessive force is without merit.  Pineda's testimony that defendant took his gun was sufficient to establish this fact even in the absence of any forensic evidence tying defendant to the gun.  A reasonable inference from the evidence was that defendant was not acting in reasonable self-defense.  It could also reasonably be inferred that defendant's acts were willful.

### 5.    Counts 7 and 8 (§ 69)

Defendant contends there was insufficient evidence to support the conviction of resisting an executive officer as charged in counts 7 (Salinas) and 8 (Pineda).  Counts 7 and 8 allege violation of section 69, which provides:  "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable . . . ."

18

As already discussed, there was substantial evidence that Salinas and Pineda were lawfully performing their duties and did not use excessive force. There was also substantial evidence from which it could be inferred that defendant knew Salinas and Pineda were engaged in the performance of their duties.

E.   *Instructional Error*

Defendant alleges three errors relating to the jury instructions: (1) reversal is required because the written jury instructions have been misplaced by the superior court; (2) it was error to deny his request for pinpoint instructions based on former Welfare and Institutions Code sections 5156 and 5157; and (3) it was error to deny his request that the jury be instructed that the tasing of defendant was excessive force as a matter of law. We find none of these contentions persuasive.

## 1. Missing Jury Instructions

Defendant contends the judgment should be reversed because he cannot effectively challenge the correctness of the jury instructions since they have been misplaced by the trial court. He argues that prejudice is demonstrated by the following.

- Pattern jury instruction CALCRIM No. 3146 reads: "If you find the defendant guilty of the crime[s] charged in Count[s] [,] . . . you must then decide whether[, for each crime,] the People have proved the additional allegation that the defendant personally used a firearm during the commission [or attempted commission] of that crime."

- As given, CALCRIM No. 3146 reads: "If you find the defendant guilty of the crimes charged in counts 1 <u>and</u> 2, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally used a firearm during the commission of that crime and return a separate finding for each crime." (Underlining added.)

- During deliberations, apparently referring to CALCRIM No. 3146, the jury asked: "Do we only consider the enhancements if we find [defendant]

19

guilty on Count 1 <u>and</u> Count 2 or Do we consider the enhancement if we find them guilty of one but not the other?"

- The trial court responded: "For each crime, you consider the enhancements. If you find the defendant guilty of count 1 or count 2."

According to defendant, the missing instructions "preclude [defendant] from questioning the correctness of the jury instruction and to further analyze the jury's confusion." We disagree.

All of the instructions given in this case are recorded in the Reporter's Transcript. Defendant has not pointed to any error in the instructions as given. In particular, there is no dispute that CALCRIM No. 3146 is a correct statement of the law, or that the trial court's response to the jury's question was legally correct. Nor has defendant shown how he might have been prejudiced by the use of the word "and" in the original instruction, assuming that were the case. Under these circumstances, defendant has failed to show how he has been prejudiced by the fact that the written instructions are missing.

### 2. Pinpoint Instructions

Defendant contends the trial court erred in denying his request for pinpoint instructions based on Welfare and Institutions Code sections 5156 and 5157. We disagree.

In October 2009, when the charged crimes occurred, Welfare and Institutions Code section 5156 required the person taking a Welfare and Institutions Code section 5150 detainee into custody to take reasonable precautions to safeguard the detainee's personal property; Welfare and Institutions Code section 5157 required that the detainee be given certain information.[5] The trial court denied defendant's request for pinpoint instructions on these requirements, which defendant argued were necessary for the jury to assess whether the officers were performing their duties lawfully. On appeal,

---

[5] Welfare and Institutions Code sections 5156 and 5157 were repealed in 2013 and replaced by similar provisions in Welfare and Institutions Code section 5150, subdivisions (e) and (f).

20

defendant argues, "without the requested jury instruction, the jury cannot measure the lawfulness of the officers' conduct." We find no error.

If defendant had allowed himself to be detained without incident, Welfare and Institutions Code section 5156 and 5157 might have come into play. But the evidence is undisputed that defendant was never detained pursuant to Welfare and Institutions Code section 5150. Once the circumstances escalated from an attempted Welfare and Institutions Code section 5150 detention to an arrest for obstruction, Welfare and Institutions Code sections 5156 and 5157 became irrelevant. Under these circumstances, the trial court properly denied the pinpoint instructions requested by defendant.

### 3.      Excessive Force Instructions

Defendant contends it was error to deny his request that the jury be instructed that the tasing of defendant was excessive force as a matter of law. This contention necessarily fails as a result of our conclusion there was substantial evidence from which the jury could conclude that Salinas and Pineda did not use excessive force. To the extent defendant is arguing that the earlier tasing of defendant was itself unreasonable, we conclude otherwise.

## DISPOSITION

The judgment is affirmed.


                                            RUBIN, J.

WE CONCUR:



BIGELOW, P. J.



GRIMES, J.

21